1  Tonna K. Farrar
   tfarrar@bffb.com
2  BONNETT, FAIRBOURN,
3  FRIEDMAN & BALINT, PC
   California State Bar No. 237605
4  600 W. Broadway, Ste. 900
   San Diego, California 92101
5  Telephone: (602) 274-1100
   Facsimile: (602)274-1199
6

7  *Attorneys for Plaintiffs*

8

9              **UNITED STATES DISTRICT COURT**
              **SOUTHERN DISTRICT OF CALIFORNIA**
10

11 SHERRIL A. DUNN and THOMAS A.              Case No.
   DUNN, individually and on behalf of all other
12 similarly situated individuals,                        **'11 CV47    MMABGS**

13
                      Plaintiffs,                 **CLASS ACTION**
14                                                **COMPLAINT**

15 v.

16
   HONEYWELL INTERNATIONAL, INC. and
17 BRIAN J. MARCOTTE,

18
                      Defendants.
19

20

21        For their complaint, Plaintiffs SHERRIL A. DUNN and THOMAS A. DUNN (the

22 "Plaintiffs"), on behalf of themselves and all others similarly situated, and to the best of their

23 knowledge, information and belief, formed upon a reasonable inquiry under the circumstances, bring

24 this action against Defendants HONEYWELL INTERNATIONAL, INC. ("Honeywell") and

25 BRIAN J. MARCOTTE (together, "Defendants"), and allege as follows:

26 **I.    JURISDICTION AND VENUE**

27        1.     ERISA governs the rights and duties of Honeywell, Marcotte and the Plan

28 Participants in Plaintiffs' employer-sponsored health care plan. 29 U.S.C. § 1132. This Court has

                                         - 1 -

1  jurisdiction of those claims under 29 U.S.C. § 1132(e).  Subject matter jurisdiction also exists under

2  both 28 U.S.C. § 1331 and §1332(d).

3        2.        Venue is appropriately established in this District under 29 U.S.C. § 1132(e)(2) and

4  28 U.S.C. § 1391because Honeywell and Marcotte each conduct a substantial amount of business in

5  this District and insure and administer the Honeywell employee welfare benefit plan both inside and

6  outside of this District; and because many Class Members reside in this District.

7  **II.      SUMMARY OF PLAINTIFFS' ALLEGATIONS**

8        3.        This is a class action seeking redress for Honeywell International, Inc.'s

9  ("Honeywell's") and Brian J. Marcotte's ("Marcotte's") unlawful practice of systematically paying

10  less than Honeywell agreed and was obligated to pay for "out-of-network" ("ONET") health care

11  services pursuant to the terms of health care benefit plans it offered to Honeywell employees.

12  Marcotte's unlawful acts were performed in his capacity as named Plan Administrator of

13  Honeywell's medical welfare benefit plans.

14        **A.      Overview of Defendants**

15        4.        Honeywell is a publicly-traded conglomerate that produces consumer products,

16  engineering services, aerospace systems and defense systems for a variety of customers, from private

17  consumers to major corporations and governments.  Honeywell is a Fortune 100 company with a

18  workforce of approximately 128,000, of which approximately 58,000 are employed in the United

19  States.  Honeywell offers, funds, and administers a variety of medical welfare benefit plans that it

20  makes available to its l employees.

21        5.        Marcotte is an employee of Honeywell; is Honeywell's Vice President of

22  Compensation and Benefits; and is the named Plan Administrator for Honeywell's medical welfare

23  benefit plan, titled "Honeywell International Inc. Benefit Plan".

24        **B.      Overview of Relevant Facts Concerning Defendants' Wrongdoing**

25        6.        The selection and purchase of health insurance is of vital importance to consumers.

26  According to a survey conducted by the Office of New York's Attorney General, obtaining

27  affordable healthcare has become consumers' number one concern.  *Health Care Report: The*

28  *Consumer Reimbursement System is Code Blue*, State of New York, Office of the Attorney General,

January 13, 2009.  This class action is about Defendants' use of methods of determining welfare benefit amounts that systematically depressed reimbursements for out-of-network healthcare services ("ONET"), thereby raising the cost of unreimbursed healthcare services for both patients and their providers.

7.     Many health insurers, including large self-insured employers such as Honeywell, offer health insurance coverage that differentiates between medical treatment rendered by (a) in-network providers who have negotiated and contracted for discounted rates with the insurer or its claims administrator, and (b) out-of-network providers who charge insured patients their usual, non-discounted rates.  Health insurance plans that permit insured individuals ("Participants") to seek medical care from out-of-network providers are more expensive than plans which limit Participants to care provided by in-network providers – *i.e.*, they require higher premium payments.

8.     Self-insured employers, including Honeywell, promise to reimburse Plan Participants who have contracted for the right to obtain ONET benefits, and agreed to pay higher premiums in exchange for that flexibility, for ONET charges at a percentage of the lesser of either (a) the actual amount of their medical bill, or (b) the usual, customary and reasonable rate (also called the "UCR" rate) charged by similar providers in the same or local geographic area for substantially the same service.  However, as set forth in this Complaint, during the Class Period Honeywell actually reimbursed its Plan Participants at a much ***lower*** rate.

9.     Plaintiffs' legal claims in this case are directed at Defendants' use of flawed data to set artificially low reimbursement rates for ONET benefits, resulting in various violations of the Employee Retirement Income Security Act of 1974, as amended, and its governing regulations and federal common law (collectively, "ERISA").  Defendants' use of flawed data to set reimbursement rates, regardless whether such use was knowing or intentional, constitutes a provable cause of consistent under-reimbursement of Honeywell Plan Participants.

10.    Defendants' wrongful conduct affects tens of thousands of Honeywell's medical Plan Participants nationwide who have paid more for ONET services as a result of Defendants' failure to pay the reimbursement amounts required by their Plan.  The cause of this failure is use of a medical data services platform known as the Ingenix Database, maintained by Ingenix, Inc. ("Ingenix"),

which is wholly-owned and operated by UnitedHealth Group, Inc. ("UHG"), the second largest health insurer in the United States. During the Class Period, Defendant Honeywell contracted with various third party administrators ("TPAs") to determine healthcare reimbursement claims, including ONET claims. Such TPAs contracted with Ingenix to obtain ONET claims data and receive ONET pricing schedules. These data and schedules were then used to calculate reimbursement for ONET services at artificially low rates ("False UCRs"). The False UCRs are presented as true UCRs, but are in fact substantially lower than the actual UCRs.

11. Ingenix contracts with most of the country's larger health insurers, and a few large self-insured employers, to collect ONET claims data. After Ingenix collects the data, it aggregates, manipulates and "scrubs" it to create False UCR schedules, which it then licenses to most of the country's health insurers and claims administrators, including the TPAs that Defendant Honeywell contracted with to administer its employee welfare benefit plans during the Class Period. Use of the False UCR schedules directly caused Honeywell to under-reimburse Plaintiffs for their rightful ONET plan benefits.

12. The Ingenix Database is controlled by UHG and other health insurers to create ONET pricing schedules for those same insurers. These health insurers have an incentive to artificially deflate the amounts of money they must reimburse Plan Participants for ONET claims. As a result, use of the Ingenix Database yields systematic under-reimbursement for ONET services.

13. Until news reports detailed the New York Attorney General's investigation, the process of setting UCRs for reimbursement of ONET services was effectively hidden from the consumers who purchase and/or participate in health insurance programs. This lack of transparency was facilitated by, *inter alia*, the following practices:

- In their healthcare plans that cover ONET services, Defendants affirmatively represented that they will reimburse according to the UCR rate, which a reasonable consumer would understand to literally mean the "usual, customary, and reasonable rate" or "reasonable and customary rate" charged for such services;

- Defendants concealed the fact that health insurers regularly and intentionally exclude important data points to depress UCRs and under-reimburse ONET services; and

- Defendants concealed that Ingenix "scrubs" the data it receives from insurers to remove information that would result in higher reimbursement rates.

14. Plaintiffs were insured by Honeywell during the Class Period. Plaintiffs also paid premiums into the Honeywell welfare benefit plan to obtain their ONET benefits. Plaintiff Sherril A. Dunn sought benefits for treatment of health issues including, but not limited to, arthritis, fibromyalgia, and a dislocated shoulder, requiring services from chiropractors and physical therapists. Plaintiff Thomas A. Dunn sought benefits for treatment of health issues including, but not limited to, a polyp on his vocal cords and subsequent recovery, requiring services from an ENT (ear, nose, throat) surgical specialist, an anesthesiologist, a pathologist, and, during recovery, a chiropractor. As alleged herein, Honeywell, through its third-party claims administrators, denied payment for substantial portions of the charges that were assessed by Plaintiffs' ONET providers, thereby shifting significant medical costs to Plaintiffs that should have been covered by Honeywell's welfare benefit Plan.

15. Honeywell, as the Plan Sponsor and Plan benefit self-insurer, and Marcotte, as the named Plan Administrator, are both subject to ERISA. Marcotte, as named Plan Administrator of Honeywell's health benefit plan, is also a statutory "fiduciary" toward Plaintiffs under ERISA.

16. Plaintiffs allege that Honeywell's wrongful underpayments, and Marcotte's failure to prevent such wrongful underpayments, violated their legal obligations to Plaintiffs and the Class as welfare benefit Plan Participants under ERISA.

17. Defendants' conduct violated their legal obligations to Plaintiffs and the Class and violated federal law as described herein, causing Plaintiffs and the Class significant financial harm. Plaintiffs seek damages and interest for Defendants' unlawful conduct.

## III.   THE PARTIES

### A.   PLAINTIFFS

18. Plaintiff Sherril A. Dunn resides in Gilbert, Arizona and brings this action on behalf of herself and all others similarly situated. As detailed below, Plaintiff Sherril A. Dunn has standing to pursue all her claims and jurisdiction and venue are appropriate.

19.     Plaintiff Thomas A. Dunn resides in Gilbert, Arizona and brings this action on behalf of himself and all others similarly situated.  As detailed below, Plaintiff Thomas A. Dunn has standing to pursue all his claims and jurisdiction and venue are appropriate.

**B.     DEFENDANTS**

20.     Defendant Honeywell offers, underwrites and self-insures health benefits, including those of Plaintiffs at issue herein.  Honeywell is incorporated and resides in Delaware, and may be served by serving its registered agent The Corporation Trust Company, at Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.  Honeywell is a publicly owned and traded company.

21.     Defendant Marcotte is located and may be served at Honeywell International Inc., Benefit Plan Reporting, 101 Columbia Rd., HR Services, SOL-5, Morristown, NJ 07960-4640.

**C.     RELATED ENTITIES**

22.     Other natural persons, corporations and entities, while not defendants in this action, have been instrumental in development and implementation of the Ingenix database and the resulting use of flawed data in health care benefit reimbursement, including:

23.     UnitedHealth Group, Inc. offers, among other things, health insurance products and services and network-based health and well-being services to beneficiaries.  A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

24.     Ingenix, Inc. is a wholly owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and others requiring health care information. The company's products and services are represented by four business groups including:   (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting.  Ingenix licenses the use of its proprietary Ingenix Database to insurers and TPAs who use it to set reimbursement schedules for out-of-network, non-negotiated medical services.   A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

25.     Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP"), is a trade group for the health insurance industry (AHIP may be referred to hereinafter as "HIAA/AHIP").   It is a national association comprised of a variety of medical entities, but notably major insurance companies.   It claims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications.

III.    FACTS

A.    **HONEYWELL HEALTH BENEFIT PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK MEDICAL SERVICES**

26.     Honeywell issues documents to each of its health Plan Participants and beneficiaries, setting forth the benefits Honeywell promises in their behalf.

27.     Like most health insurance plans, Honeywell's plans differentiate between: (a) coverage for medical treatment from "in-network" providers who have negotiated discounted rates with Honeywell's claims administrator, and (b) coverage for treatment from "out-of-network" providers who charge Honeywell's ONET Plan Participants their usual, non-discounted rates. Health insurance plans contracting with in-network providers preclude those in-network providers from billing insured patients in excess of the contracted-for in-network rates.   Conversely, out-of-network providers have no service contract with the insurer or its claims administrator, and are not precluded from billing their usual rates.   In cases where the out-of-network provider bills in excess of what Honeywell decides to pay, the balance not paid by Honeywell is the responsibility of the Honeywell Plan Participant.

28.     When Honeywell Plan Participants receive ONET services, Honeywell's payment is based on a percentage of the lesser of the billed charge, or what Honeywell describes in Plaintiffs' Plan Documents as the "Reasonable and Customary" rate (another name for the UCR rate) for the service received.   Plaintiffs' Honeywell Plan defines "Reasonable and Customary" as follows:

> A Reasonable and Customary charge is measured and determined by the Plan Administrator by comparing the actual charge for the service or supply with the prevailing charges made for it. The Plan Administrator determines the prevailing charge. It takes into account all pertinent factors including:

- The nature and severity of the Injury, Illness, or condition being treated;

- The complexity of the service;

- The range of services provided; and

- The prevailing charge level in the geographic area where the provider is located and other geographic areas having similar medical cost experience.

29.     The portion of ONET charges not reimbursed by Honeywell is not credited toward satisfying deductibles or out-of-pocket maximums, which limit the total amount a Plan Participant must pay for medical services during the Plan year.

**B.     THE INGENIX DATABASE AND DEFENDANTS' DETERMINATION OF UCR**

**1.     Development of the Ingenix Database**

30.     Ingenix, a wholly owned subsidiary of UHG, is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies.  Ingenix creates "modules" or uniform claims pricing schedules, which provide whole dollar reimbursement amounts for each price percentile (for instance, the 80th percentile) for a given medical procedure in localized geographic areas.  All users of the Ingenix Database, e.g., Defendants and their claims administrators, are given the same dollar amounts by percentile for each particular procedure within a geographic area.

31.     In 1973, HIAA created a database known as the Prevailing Health Charges System ("PHCS") as a way to aggregate and compile physician charge data as a service to its insurer members.  The PHCS was formed by obtaining historical charge data for surgical and anesthetic procedures from HIAA's members, including health insurance companies, TPAs, and self-insured employers.  HIAA later expanded PHCS to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998).  HIAA committees and advisory groups comprised of insurance company HIAA members were responsible for PHCS's development and management and caused the PHCS database to become populated with flawed data.

- 8 -

32. Once created, PHCS became the largest pool of medical service charge data in the country, despite its many flaws. It contained data from more than 150 payor contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands.

33. The information HIAA collected from its member insurers, however, consisted only of four data points: the date of service, the CPT Code, the billed charge, and the location or "geo-zip" (defined below). This was the only information that HIAA sought from its members to create the PHCS.

34. Current Procedural Terminology ("CPT") codes are a system by which the American Medical Association categorizes all medical services by five-digit codes. "Geo-zips" are portions of states comprised of cities and towns sharing the first three-digits of a postal zip code. Ingenix grouped geo-zips and (depending on population density) combinations of geo-zips together because of geographic proximity and what it arbitrarily concluded were "data similarities."

35. In fact, HIAA (via its committees and Board of Directors) consciously limited the amount of information it gathered from data contributors to the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

36. Once HIAA obtained the "questionable" data, it compiled the submissions and created the PHCS, which it then licensed to its members as a service. However, HIAA expressly informed insurers that the PHCS was not intended to be used to establish UCR rates.

37. Thus, the PHCS was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – only to provide a general idea about prevailing charges in a given area, based upon admittedly limited data that HIAA collected.

38. HIAA provided a disclaimer with the PHCS data:

> The DATA, whether actual charge data, derived charge data, conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only. The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of stay. Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE. THE LICENSEE

- 9 -

1
2

> MUST NOT represent the DATA in any way other than as expressed
> in this paragraph.

3    39.   "Derived charge data" are reported by the PHCS database for CPT codes for which

4   fewer than nine charges have been reported by data contributors.  The PHCS database derives charge

5   data for approximately 90% of all CPT codes because the vast majority of data reported is for the

6   most common 10% of CPT codes.  Creation of derived data, including the conversion factor, is

7   discussed in detail beginning at ¶ 70.  The MDR database (see *infra*, ¶¶ 43-44) derives charge data

8   for all CPT codes.

9    40.   PHCS was designed to provide limited information about provider charges, but not to

10   determine precise reimbursement amounts.

11    41.   In October 1998, HIAA sold PHCS to Ingenix.  PHCS is now part of the Ingenix

12   Database.

13    42.   In December 1997, Ingenix purchased Medicode, Inc., a Salt Lake City-based

14   provider of healthcare products that, among other things, sold a provider charge database known as

15   "MDR".

16    43.   As Ingenix acquired MDR and PHCS, it kept the databases separate but merged the

17   underlying data.  MDR and PHCS used different methodologies to produce output for the two

18   databases.  As a result, the dollar amounts differed between the databases for individual CPT codes

19   at the same percentile.  Defendants and one or more of Defendants' claims administrators applied the

20   MDR or PHCS database from Ingenix to Plaintiffs' ONET claims.

21    44.   The Ingenix Database is marketed by UHG as the "industry standard."

22    45.   To create its database, Ingenix enters into data contribution contracts and licenses

23   with health insurers to (i) obtain data and information surrounding billing rates from those health

24   insurers; and/or to (ii) provide UCR uniform pricing schedules to those same health insurers for

25   paying ONET claims.  Ingenix offers the Ingenix Database to health insurers at a discounted rate or

26   free if those insurers agree to provide data to Ingenix to create that very database.

27         **2.    Honeywell Uses The Ingenix Data Despite Ingenix's Disclaimer**

28

- 10 -

46.     Honeywell and its claims administrators use the information received from Ingenix to determine UCR rates for ONET claims, even though Ingenix broadcasts that it is not endorsing, approving or recommending use of its data for UCR rates.

47.     Ingenix updates its database semi-annually.   With each semi-annual database iteration, Ingenix includes the following disclaimer:

> The Ingenix data, whether charge data or conversion factor data, are provided to subscribers for informational purposes only.  Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data.  There is neither a stated nor an implied "reasonable and customary charge" (either actual or derived).

48.     Throughout the relevant period, Defendants and their benefit claims administrators have been aware of the disclaimer, but did not disclose its substance or even its existence to Honeywell Plan Participants.  Instead, Defendants repeatedly "represented" the Ingenix data to be other than as described in the disclaimer.  Defendants use both actual and derived data as a "Reasonable and Customary charge", in direct contravention of the disclaimer and federal and state law.

49.     Despite its own disclaimer, Ingenix continues to license its database to Defendants' claims administrators for ONET reimbursements, which turn out to be artificially low.  Indeed, UHG and Ingenix promise that Ingenix Database users, including Defendants and their claims administrators, will achieve substantial savings, including a 16:1 return on the Ingenix license investment.

**3.     Ingenix's Method of Collecting Data Is Not Scientifically Valid**

50.     To create and update its database, Ingenix relies entirely on data from its various information providers under its "data contribution program," in which health insurers who are Ingenix licensees submit information about the amounts they have been billed by an undisclosed number of unidentified health care providers for specific CPT or "HCPCS" code services. Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by CMS, the Centers for Medicare and Medicaid Services, and are based on the CPT system.

51.     There are two preferred methods by which samples may be collected for the purpose of statistical analyses:  (i) the sample may be a "scientific" sample, which is essentially a random sample of an entire population, within which each population element has a known, nonzero chance of being included; or (ii) the sample can be a "judgment" sample, in which the sample elements are handpicked because they are expected to represent a relevant population and serve a specific research purpose.

52.     The sample collected by Ingenix consists of whatever information those insurers that happen to be data contributors happen to contribute and which happen to survive the Ingenix scrubbing process (see *infra*, ¶ 67).  This is not a scientific sample because it is not a random sample of any entire population (e.g., of all medical service charges).  It is not a judgment sample because the data was not deliberately selected to represent a relevant population and serve a specific research purpose.  Instead, the Ingenix Database is based on data collected from a sampling method known as "convenience" sampling.  A convenience sample is also known as an "accidental" sample, because the data are included in the sample as if by accident.  This sample would be statistically flawed even if Ingenix's data contributors turned over to Ingenix all of their charge data (which they do not, see *infra*, ¶¶ 59-60), because Ingenix data contributors are self-selected without regard to the representativeness of their contributed charge data.  That is, the universe of claims, to which this data is ultimately applied, is considerably larger than the self-selected sample, and is not homogeneous.

53.     The major disadvantage of convenience sampling is that one cannot assure the representativeness of the information collected with respect to the population (e.g., of all medical service charges) as a whole.  In such a case, it is incumbent on the data collector to externally test and validate the sample to ensure that the sample is representative of the population.  A large sample size does not ensure accuracy or comprehensiveness.

54.     Ingenix and Defendants are aware of these flaws in the sampling procedures used to form the Ingenix Database.  However, neither Ingenix nor any insurer, including Defendant Honeywell, has ever tested or validated the data comprising the Ingenix Database to determine

- 12 -

whether such data is representative of the population that the Ingenix Database purports to describe, i.e. the set of all medical service charges in the United States for a given time period.

### 4.  Ingenix Uses Inadequate Data Points

55.     Following a Plan Participant's treatment by an ONET provider, that provider submits a standardized claim form to Honeywell's claims administrator.  That claims administrator then extracts information from the claim form to submit to Ingenix.  However, the only information provided from the claim form to Ingenix is these four data points:  (a) the date of service; (b) the CPT code; (c) the geo-zip where the service was provided; and (d) the amount billed.

56.     During 2005, HIAA members discussed submitting more than these four data points to Ingenix, recognizing expressly that the four data points were limited and inadequate as the basis from which to calculate accurate UCR rates.  Additional potentially relevant data points included provider identification, licensure, specialty, patient age and gender, and type of facility in which the service was provided.

57.     Despite this express acknowledgement that the four data points were limited and inadequate, the HIAA members opted to continue to submit only the four above-listed elements to Ingenix.  Defendants never advised Honeywell's Plan Participants of the inaccuracy caused by using only four data points, or of the failed attempt to expand the number of data points collected.

58.     Health insurers thus continue to enter these four simple data points onto a standardized claims submission form provided by Ingenix.  However, prior to submission to Ingenix, health insurers first "scrub" their claims submissions forms to remove the highest charges, submitting only the lowest claim amounts for a given service.  This results in a lower average cost for each service scrubbed.

59.     UHG and other health insurers affirmatively manipulated the data they contributed to Ingenix to incrementally push their collective ONET reimbursements lower.

60.     Once Ingenix receives the data contribution forms (containing only four data points), it then combines that information from all data contributors to create the Ingenix Database.

61.     Because it only tracks four data points on its data contribution forms, Ingenix necessarily uses only those four elements (date of service, CPT code, geo-zip, and amount billed) to

create the Ingenix Database.  This is a classic example of "garbage in, garbage out". These four data points do not identify the provider or his/her credentials or level of experience, the patient (including age and condition), any adjustment for cost of living factors, the specific provider discipline performing the services (e.g., physician or non-M.D.), the provider's usual charge and licensure, the type of facility where the service was performed (e.g., hospital, clinic, doctor's office, nursing home or intensive care unit), or the prevailing fee or charge level for any provider or service in a particular geographic region.

### 5.   Ingenix Manipulates Modifiers

62.   Ingenix further decreases the amount of specificity provided on the data contribution forms by removing any CPT "modifiers" contained on those forms.  Modifiers consist of a two-digit suffix that providers append to a five-digit CPT code to signify an alteration or augmentation of the stated service or otherwise identify the circumstances in which the service was provided.

### 6.   Ingenix's Flawed Use Of Geozips

63.   The Ingenix Database does not always locate data to the specific geographic area where its resulting UCR would apply.   Instead, Ingenix divides all states into geo-zips and (depending on population density) combinations of geo-zips, grouped together by geographical proximity and what Ingenix concludes to be "data similarities."   These derived geo-zips are not medical service areas amenable to cost comparison.

64.   Distortions created by using "geo-zips" are recognized by Ingenix.  In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area.  For example, many different three digit areas contain both urban and rural locales with different charging patterns.  Use your judgment to determine how to interpret the fee range for your particular community.

65.   Defendants fail to exercise reasonable judgment when determining validity of the specific geo-zip applicable to a particular UCR determination, including whether it contains "urban and rural locales with different charging patterns."   Instead, Honeywell relies strictly on the

- 14 -

1   geographic groupings utilized in the Ingenix Database, without taking into account different

2   charging patterns within the geo-zip.

3   **7.    Ingenix "Scrubs" the Contributed Data**

4   66.    After Ingenix receives data contribution forms from individual insurers (which those

5   insurers have already scrubbed), it then "re-scrubs" the pooled data to remove high-end values but

6   not low-end values, so as to lower the average amount of ONET reimbursements.  Ingenix makes

7   formulaic edits to identify purported statistical outliers, then automatically removes them without

8   factual basis or investigation to determine whether they are truly incorrect (and should be removed)

9   or are simply valid high charges.  Incorrect removal of valid high charges biases the entire data set

10  downward.

11  67.    Using the results of these data collection procedures, Ingenix then produces two

12  cycles of uniform pricing schedules each year, which include medical, surgical, anesthetic, and

13  coding system service rates for a given geographic area and CPT or HCPCS code.   When

14  Defendants' claims administrators receive these uniform pricing schedules, they are uploaded onto

15  computerized claim administration platforms and systematically used to determine UCR rates for

16  Honeywell's ONET claims.

17  68.    Honeywell's claims administrators' computer systems automatically adjudicate

18  Honeywell ONET claims, without human intervention.  The Ingenix Database is automatically

19  applied.  No human intervention occurs at or for Honeywell to evaluate individual claims or the

20  accuracy of any UCR provided by Ingenix.

21  **8.    The Derived Data Is Flawed**

22  69.    The "conversion factor data," which is used to develop the "derived" data referred to

23  in the HIAA disclaimer (see *supra*, ¶ 48), are not the charge data contributed to Ingenix.

24  70.    Throughout the relevant time period, derived data has set UCR reimbursements for

25  the majority of medical and surgical services nationwide.  Derived data is not specific to a provider,

26  patient or procedure (CPT code).  Rather than setting out rates for healthcare services based on what

27  providers actually charge in the marketplace, derived data uses a "relative value" assigned to each

28  discrete medical procedure that is multiplied by a "conversion factor".  As a result, there is no

- 15 -

relationship between the derived data and providers' actual charges in the marketplace.  Moreover, there is no scientific or other kind of support for Defendants' use of derived data from the Ingenix Database to set ONET UCR reimbursement.

71.    Derived charges do not reflect necessary, reasonable and customary charges made by actual providers; rather, they are artificial prices imputed into the Ingenix Database.

72.    CPT Codes combined to derive data frequently describe diverse procedures, ranging from the most simple (and, generally, lowest cost), representing the largest cohort of charges, to the most complex (and, generally, highest cost).  For derived charges to provide a valid determination of reasonable compensation levels, an adjustment must be made to account for respective distribution and spread of common and less common procedures.  This adjustment requires computation of standard deviations.  This computation is not performed by Ingenix or either Defendant.  Because Ingenix and Defendants fail to consider that some CPT codes have a wider distribution of charges (i.e., standard deviation among billed charges) than others, the derived charge percentiles understate the true upper percentile values for those CPT codes.  This is a material statistical flaw because those CPT codes with a large number of observations tend to represent the most frequent procedures, but are being grouped with CPT codes with fewer observations that tend to represent relatively less common procedures.  Thus, the derived data, which is improperly calculated, does not comply with Defendants' UCR definitions as presented to Class members.

73.    Ingenix cannot guarantee that all claims received for reimbursement of a particular CPT code during any given time period have been reported, much less accurately reported, by its data-contributing insurers.  Nor can Ingenix ascertain whether the listed provider bills represent the unnamed providers' usual and customary charges for the service, or, instead, reflect a discounted rate required by PPO Service Provider Agreements the provider may have entered with other insurers.  While Ingenix requires certification that billed CPT code data are accurate and complete, it is at the mercy of its self-interested data contributors because there is no Ingenix mechanism to validate or enforce client data certificates.

74.   Ingenix has never tested its results to determine whether its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged by any Class member provider.

75.   The end result of this cycle of self-interest and collusion is a database that produces uniform and flawed pricing schedules, and is then used by Defendants to under-reimburse providers for ONET services.  The flaws in the Ingenix Database are pervasive, and include:

a.   questionable accuracy of contributed underlying data;

b.   failure to inquire whether all contributors apply the same data production criteria and coding and data aggregation methods;

c.   failure to inquire regarding each or any individual contributor's data production criteria and coding and aggregation methods, and whether such individual contributor adheres to such criteria and methods accurately or consistently;

d.   when not enough charge data are present for a CPT code to provide a statistically valid sample, Ingenix aggregates data from similar codes to create a sample deemed "large enough";

e.   Ingenix considers geo-zips and combinations of geo-zips to constitute "sociodemographic regions", though there is no empirical verification that such regions constitute medical service areas amenable to service cost comparison;

f.   scrubbing of claims data by Ingenix, removing outliers in a subjective manner, i.e., removing high-end values but not low-end values;

g.   failure to apply any appropriate statistical methodology (including sampling, data editing and data estimation), resulting in data that are inappropriately biased lower;

h.   scrubbing by contributors of the data Ingenix receives, resulting in data flawed even before Ingenix scrubs it;

i.   inclusion of charges for procedures in non-comparable geographic areas;

j.   failure to segregate performed procedures by provider discipline, education or skill, instead combining all gathered discrete CPT codes;

k.      combining ONET provider claims with "in-network" provider claims, thus skewing the ONET data downward due to PPO contract fees;

l.      ignoring supply and demand, not distinguishing between the quantities of providers reflecting charges in various geo-zips; and

m.      failure to edit out claims reflecting negotiated or contractually discounted charges.

76.    As the Staff Report to the Senate Committee on Commerce, Science, and Transportation, "Underpayments to Consumers by the Health Insurance Industry" (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . . In testimony before the Senate Commerce Committee in March 2009, UnitedHealth Company's CEO publicly expressed his regret that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .
>
> Evidence collected during private litigation and the New York Attorney General's investigation demonstrated how the less-than-arms-length relationship between Ingenix and the insurance industry led to reimbursement practices that cost American consumers billions of dollars.  Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges.  Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

77.    Insurers' use of the Ingenix Database to determine UCR rates and under-reimburse ONET claims relies, in part, on keeping the Ingenix Database and its inherent flaws a complete secret from healthcare consumers, including Plaintiffs and the Class.  To do so, payors like Defendants actively conceal the true UCR rates from Plaintiffs and the Class, knowing that usefulness of the Ingenix Database as a cost-saving measure will be jeopardized if they disclose or pay the true UCR rates.

**B.    THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF THE INGENIX DATABASE**

78.     In an investigation into the flawed Ingenix Database conducted by the then Attorney General of the State of New York, Andrew M. Cuomo, Mr. Cuomo concluded that "the Ingenix databases in fact under-reimburse consumers."  State of N.Y. Office of the Att'y Gen., Health Care Report: The Consumer Reimbursement System is Code Blue (January 13, 2009).

79.     According to the Attorney General's report, an analysis of the New York City market showed that payors using the Ingenix Database and similar products to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

80.     "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id.*  Plaintiffs and the Class are direct victims of this systematic under-reimbursement, including by Defendants.

81.     Plaintiffs and the Class have been harmed by Defendants' systematic under-reimbursement of healthcare claims, through disruption of their physician–patient relationships. According to the Attorney General:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

*Id.*

82.     In discussing where the blame for this pervasive under-reimbursement should lie, the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone. All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.*  Defendants, as significant beneficiaries of

- 19 -

the Ingenix Database, should be held accountable for using it to under-reimburse Plaintiffs and the Class.

83.     Simultaneous with release of these NYAG findings, UHG, the ultimate and controlling owner of the Ingenix Database, agreed to settle all claims against it centering on the Ingenix Database and UCR reimbursements, with the NYAG and the American Medical Association ("AMA"), among others.   As part of the NYAG settlement, UHG agreed to pay the NYAG approximately $50 million.   These funds are earmarked to help create an independent non-profit organization that will own and operate a new database to be used for UCR determinations.  This new database will be designed to replace the Ingenix Database.

84.     Although the first, UHG was not the only insurer to settle claims with the NYAG concerning wrongful use of the Ingenix Database.  Use of the Ingenix Database is so widespread that several insurers settled similar claims with the NYAG, in what has become an historic effort to begin overhaul of the nation's out-of-network healthcare reimbursement system.  On January 15, 2009, the NYAG announced a settlement with Aetna for $20 million; on February 4, 2009, the NYAG announced a settlement with MVP Health Care, Inc. for $535,000; on February 10, 2009, the NYAG announced a settlement with Independent Health for $475,000 and HealthNow New York, Inc. for $212,500; on February 17, 2009, the NYAG announced a settlement with CIGNA for $10 million; on February 18, 2009, the NYAG announced a settlement with WellPoint, Inc. for $10 million; on March 3, 2009, the NYAG announced a settlement with Guardian Life Insurance Company of America for $500,000; and on March 5, 2009, the NYAG announced a settlement with Excellus Health Plan for $775,000 and Capital District's Physician Health Plan for $300,000.  The funds from each of these settlements have been paid to the qualified non-profit organization charged with establishing the new and independent claims database for ONET reimbursement rates.

C.     **THE UNITED STATES SENATE'S INVESTIGATION OF THE INGENIX DATABASE**

85.     The United States Congress is actively investigating use of the Ingenix Database in setting UCR amounts.  The Senate Committee on Commerce, Science, and Transportation recently held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers

Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for ONET claims; specifically, how the industry calculates UCR rates for ONET healthcare providers.

86.     At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV, speaking for a majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans pay for health insurance intended to give "them the option of going outside of their provider networks for care," but the insurance companies are not living up to their end of the bargain:

> Let's be very clear about this.  The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts.  Consumers are paying for this option - through higher premiums and higher cost sharing.  There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option.  One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not.  The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area.  Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

87.     Senator Rockefeller specifically addressed the New York Attorney General's findings about the insurance industry's wrongful use of the Ingenix Database:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates.  A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates.  Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers.  For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying.  The source of the skewed data was Dr. Slavitt's company, Ingenix.

- 21 -

88.     Due to the insurance industry's fraudulent use of the Ingenix Database, the Senate Committee is evaluating whether more federal oversight and regulation of the insurance industry, including self-insured entities like Defendants, is necessary.  Today, however, the only means of redress for insureds such as Plaintiffs and the Class is through the federal courts.

**D.     DEFENDANTS' OTHER WRONGDOING**

**1.     Deductible And Out-Of-Pocket Limits**

89.     Honeywell's obligation to pay health benefits arises once a beneficiary has satisfied his or her annual deductible amount, which is specified in Honeywell's welfare benefit Plan Document. In addition, when a Plan Participant (insured individual) reaches the benefit plan's specified out-of-pocket limit for the year, Honeywell's obligation to pay benefits increases. The out-of-pocket limit is referred to in a Honeywell Participant's Plan as the "out-of-pocket maximum" and will be so referred to here.  Once a Plan Participant's allowed amounts for services, in total, reach the out-of-pocket maximum specified in the Plan Document, the Participant has no further obligation to pay any share as coinsurance. So, for example, when the total of allowed amounts (for an individual) is below $1,904, Honeywell is obligated to pay (the lower of the billed charge, or) 70% of UCR, and a Plan Participant is obligated to pay coinsurance of 30% (for that individual).  After a Plan Participant's allowed amounts paid during a calendar year total at least $1,904, Honeywell must pay 100% of UCR, and a Participant's coinsurance obligation concludes for that calendar year.

90.     By the terms of the Honeywell Summary Plan Description, the allowed amount is the lesser of the provider's actual charge or the UCR. Any amount of the billed charge above UCR does not count toward either the deductible or the coinsurance charge limit. If the UCR is determined improperly, then the amounts counted toward the deductible and/or the coinsurance charge limit based on such UCR will also be too low.  This creates a double penalty on Plaintiffs and Class Members incurring ONET claims.

91.     Honeywell's claims administrator(s) calculated the deductible and the out-of-pocket maximum using inappropriately-reduced UCR amounts, and failed to credit the difference between the actual charge and the allowed charge to the deductible or to the out-of–pocket maximum. Honeywell is therefore paying too little of the claim (70% of the improperly reduced UCR), while

- 22 -

the Plan Participants remain financially responsible for too large a portion of the claim (30% of UCR, plus the difference between the billed amount and the allowed charge).

### 2. Failure to Pay Interest

92.     Defendants have improperly caused Honeywell's reimbursements to be reduced by violating the terms of Plaintiffs' healthcare plan, and Defendants owe restitution of the improperly denied amounts and interest on such amounts.

### E. PLAINTIFFS' CLAIMS WERE UNDER-REIMBURSED BY DEFENDANTS, AND APPEAL IS FUTILE BECAUSE INGENIX IS RE-APPLIED ON APPEALS

93.     Plaintiffs Sherril A. Dunn's and Thomas A. Dunn's benefits were determined under Honeywell's POS Retiree Medical/Vision Plan, which is a self-insured welfare benefit plan governed by ERISA.  As an employee of Honeywell, Plaintiff Sherril A. Dunn was the Subscriber to the Plan.  Plaintiff Thomas A. Dunn was a Beneficiary under the Plan.  Defendants provided Plaintiffs a Summary Plan Description ("SPD") setting forth in detail the terms of their Plan.

94.     Plaintiffs allege, as detailed herein, that Defendants relied on flawed and inappropriate data to make UCR determinations for Plaintiffs' ONET benefits using the Ingenix Database, resulting in systematic ONET benefit under-reimbursements to Plaintiffs and other Honeywell Plan Participants.  By making such under-reimbursements, Defendants breached their duties under ERISA and as set out in Honeywell's ERISA-governed Plan.  As a result, Defendants should be required to reimburse those Participants who received wrongfully-reduced ONET benefits.

95.     Plaintiff Sherril A. Dunn suffered improper UCR benefit reductions made by Defendants in 2006 and 2007 after she received health care services from Steven P. Brown, a chiropractor, acupuncturist and physiotherapist, and Craig A. Blankinship, a physiotherapist.  EOBs ("Explanation of Benefits") showing UCR-related benefit reductions for services provided by Steven P. Brown were processed between at least June 30, 2006, and February 2, 2007, for services performed between June 19, 2006, and October 25, 2006.  EOBs showing UCR-related benefit reductions for services provided by Craig A. Blankinship were processed between at least May 23, 2007, and June 20, for services performed between May 15, 2007, and June 13, 2007.

96.     Plaintiff Thomas A. Dunn suffered improper UCR benefit reductions made by Defendants in 2009 after he received health care services from Greg J. Vogel, a chiropractor.  An EOB showing UCR-related benefit reductions for services provided by Greg J. Vogel was processed on November 3, 2009, for services performed on September 18, 2009.

97.     UCR benefit reductions were accompanied by the following "Explanation of Remarks" codes:

UC2:         Maximum reimbursable rate used.  If applicable, member responsibility is charged amount minus total plan benefit. Provider may balance bill you.

UC3:         Member is not liable for charges over the member responsibility.  If billed over this amount please contact member services.

98.     Plaintiffs did not complete the administrative appeals procedure provided for in their Plan SPD.  However, any such appeal would have been futile.  Accurate UCR determinations by Honeywell are impossible because Defendants rely solely on Ingenix's flawed data in making health benefit reimbursement determinations, both initially and on appeal.

99.     Plaintiffs have been damaged in the amount of the difference between their actual health benefit reimbursements and the reimbursements that would have been made had Defendants used true UCRs to determine reimbursement amounts.

## F.     DEFENDANTS' MISREPRESENTATIONS AND FRAUDULENT CONCEALMENT OF THE TRUTH

100.    To calculate their reimbursement amounts for ONET claims, Defendants use the Ingenix Database to determine UCR rates.

101.    Defendants and/or their third party claims administrator(s) agreed through claims administration agreements to use the flawed data incorporated in the Ingenix Database, yielding artificially low UCR rates and ONET reimbursements by Honeywell, and higher out-of-pocket expenses for Plan Participants.

102.    Defendants represent through their self-insured Plan Documents that they will permit their Participants to choose between in-network and out-of-network providers and that Participants

will be reimbursed based on the UCR for ONET claims.  Nevertheless, Defendants do not reimburse ONET claims based on the UCR; they use reimbursement rates they know are skewed downward, thereby increasing consumers' ONET costs and denying them a free choice between in-network and ONET providers.  By affirmatively misrepresenting the level of ONET reimbursement and the extent to which consumers can choose between in-network and ONET providers, and by failing to disclose that ONET reimbursements are calculated from False UCRs, Defendants have deceived Plaintiffs and the Class.

103.    Defendants have no incentive to prevent or investigate any risk of downward-skewed, inaccurate claims data.

104.    Defendants know their use of Ingenix as a cost-saving measure will be jeopardized if anyone discloses the higher and true ONET claims data.    Defendants and/or their claims administrator(s) operate Ingenix as a "black box", such that Participants in Honeywell health plans, including Plaintiffs, have no practical ability to find out how Ingenix calculates UCR rates.  Defendants do not disclose that they use Ingenix to calculate the UCR rate, nor that Ingenix is wholly owned by an insurance company.

105.    Defendants concealed their fraudulent conduct from Plaintiffs and the Class.  Defendants also prevented Plaintiffs and members of the Class from knowing or discovering the methods by which Ingenix determines the UCR rates.  As summarized in the Senate Report, Dr. Nancy Nielson, then President of the AMA, testified, "when doctors asked insurers how they had calculated their 'usual and customary' rates, they were told that information was 'proprietary.'" Moreover, the fraudulent conduct alleged herein was of a self-concealing nature.

106.    Plaintiffs and Class members paid for ONET coverage, obtained ONET services, and had a right to a fair and accurate calculation of ONET reimbursement.

107.    Defendants were, and continue to be, under a continuing duty to disclose to Plaintiffs and the Class the fact that their ONET reimbursements were based on UCR rates that bore, and continue to bear, little relationship to actual charges for those medical expenses.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of their ONET reimbursements, Defendants are estopped from relying on any statutes of limitations.

- 25 -

## IV.   CLASS ACTION ALLEGATIONS

### A.   Class Definitions

108.   Plaintiffs Sherril A. Dunn and Thomas A. Dunn bring this action on their own behalf and on behalf of the "Class," defined as:

> All persons who are, or were, from January 1, 2006, to the final termination of this action ("Class Period"), Participants in any healthcare welfare benefit plan self-insured by Honeywell and subject to ERISA, who received medical services or supplies within the boundaries of the United States of America from an ONET provider (or any provider Honeywell considered ONET for purposes of benefit reimbursement) for which Honeywell, or any third party acting on behalf of Honeywell, allowed less than the provider's billed charge due to a benefits determination by Honeywell or such third party based on use of the Ingenix Database.

### B.   Common Class Claims, Issues And Defenses

109.   The following common class claims, issues and defenses for Plaintiffs and the Class have arisen during the Class Period:

a.   Whether Defendants' use of the Ingenix Database to calculate UCR in determining ONET reimbursement breached Defendants' legal obligations to Participants in Honeywell's self-insured health plans;

b.   Whether Defendants' ONET benefit reductions described in this Complaint violated ERISA or other applicable law;

c.   Whether ERISA requires each Class member to prove exhaustion of administrative remedies or otherwise provide a basis for excusing exhaustion before seeking relief;

d.   Whether Class members (including those who assigned their claims) may recover unpaid welfare benefits;

e.   Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid welfare benefits under ERISA;

f.   Whether Defendants' benefit claims review procedures comply with ERISA;

g.   The standard of review applicable to Defendants' ONET benefit reductions;

h.   The identity and scope of the ERISA plans subject to this Complaint;

- 26 -

i.      Whether Defendants' concealments of material fact bar Defendants from asserting the otherwise applicable statute of limitations;

j.      Whether Defendants' calculation of Honeywell Participants' deductible and out-of-pocket ONET amounts violate Plan language and applicable law;

### C.      Additional Class Action Allegations

110.    The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of more than fifty thousand Plan Participants in healthcare welfare benefit plans self- insured by Honeywell. The precise number of members in the Class is within Honeywell's custody and control.  The numerosity requirement of Rule 23 is easily satisfied for the Class.

111.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

112.    The named Plaintiffs' claims are typical of the claims of the Class members because, as a result of the conduct alleged herein, Defendants breached their respective statutory and contractual obligations to Plaintiffs and the Class through and by the uniform patterns or practices described above.

113.    Plaintiffs will fairly and adequately protect all Class members' interests.  They are committed to vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and in the prosecution of ERISA welfare benefit claims, and they have no interests antagonistic to or in conflict with those of the Class.  For these reasons, Plaintiffs are adequate class representatives.

114.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Defendants.

115.    A class action is superior to other available methods for fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied individual Class members may be relatively small, the expense and burden of

individual litigation makes it impossible for Class members to individually redress the harm done them.  Defendants maintain or control computerized claims information which enables them to calculate unpaid amounts resulting from individual ONET benefit reductions.   Given the uniform policies and practices at issue, and the limitation of claims herein to a single self-insured employer, there will be little difficulty in managing this litigation as a class action.

**V.      CAUSES OF ACTION**

<u>**COUNT I**</u>

**CLAIM FOR UNPAID BENEFITS UNDER WELFARE BENEFIT PLANS GOVERNED <u>BY</u> <u>ERISA</u>**

**(On Behalf Of Plaintiffs And The Class)**

116.    The allegations contained in this Complaint are realleged and incorporated by reference as if fully set forth herein.  Plaintiffs assert this claim on their own behalf and on behalf of the Class members.

117.    Honeywell must pay benefits to Honeywell Plan Participants who are insured by Honeywell pursuant to the terms of Honeywell's self-insured ERISA welfare benefit plans and in compliance with applicable federal and state laws.

118.    Defendants violated their legal obligations under ERISA-governed plans and federal common law each time they made the ONET benefit reductions described in this Complaint, including violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

119.    Where any Defendant acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion over Plan Participant benefits, or determines final welfare benefit appeals, such Defendant is liable to affected Class members for those underpaid benefits.

120.    Plaintiffs, on their own behalf and on behalf of the Class, seek unpaid benefits, recalculated deductible and coinsurance amounts, and interest back to the date the affected claims were first submitted to Defendants.  Plaintiffs also sue for declaratory and injunctive relief, including enforcement of the plan terms and to clarify rights to future benefits.  Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against all Defendants.

## VI.    REQUESTED RELIEF

**WHEREFORE**, Plaintiffs and the Class demand judgment in their favor against Defendants as follows:

a.    Certifying the Class as set forth in this Complaint, and appointing named Plaintiffs as Class representatives for the Class;

b.    Declaring that Defendants have breached the terms of their Plan Documents and awarding unpaid benefits to Plaintiffs and Class members;

c.    Compelling Defendants to allow the provider's billed amount, and to pay additional benefits plus interest to Plaintiffs and the Class based on the new allowed amount, in every instance in which Defendants reduced reimbursements due to usual, customary and reasonable rate determinations based on flawed or inadequate data, including through Defendants' reliance on the Ingenix Database in violation of contractual terms of Honeywell's self-insured Plan Documents;

d.    Compelling Defendants to recalculate deductibles and coinsured charge limits based on the provider's charge (rather than the usual, customary and reasonable amount) in every instance in which they improperly reduced benefits;

e.    Ordering Defendants to recalculate and issue unpaid benefits to Plaintiffs and Class members that were underpaid as a result of Defendants' out-of-network benefit reductions;

f.    Awarding prejudgment interest; and

g.    Granting such other and further relief as is just and proper.

### JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Each attorney set forth below is representing that the allegations with respect each of to his or her clients have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Respectfully Submitted,

Tonna K. Farrar
California State Bar No. 237605

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.
600 W. Broadway, Ste. 900
San Diego, California  92101
Telephone:  (602) 274-1100
Fax:  (602) 274-1199
Email:  tfarrar@bffb.com


Michael C. Dodge
Texas State Bar Number: 05937000
Attorney for Plaintiff
GLAST, PHILLIPS & MURRAY, P.C.
2200 One Galleria Tower
13355 Noel Rd., L.B. 48
Dallas, Texas 75240-1518
Telephone:  (972) 419-8300
Fax:  (972) 419-8329
E-mail:  mdodge@gpm-law.com


Andrew S. Friedman
Arizona State Bar Number:  005425
Attorney for Plaintiff
BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.
2901 North Central Avenue, Suite #1000
Phoenix, Arizona 85012
Telephone:  (602) 274-1100
Fax:  (602) 274-1199
E-mail:  afriedman@BFFB.com

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SHERRIL A. DUNN and THOMAS A. DUNN, individually and on behalf of all other similarly situated individuals,

**DEFENDANTS**

HONEYWELL INTERNATIONAL,INC. and BRIAN J. MARCOTTE,

**(b)** County of Residence of First Listed Plaintiff   MARICOPA, AZ
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Tonna K. Farrar, Bonnett Fairbourn Friedman & Balint, PC
600 W. Broadway, Suite 900, San Diego, CA 92101; (619) 756-7095

Attorneys (If Known)

'11CV47   MMABGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☒ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C. § 1132

Brief description of cause:
Class Action claim for unpaid benefits under ERISA, Declaratory and Injunctive Relief

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE                      DOCKET NUMBER

DATE
01/10/2011

SIGNATURE OF ATTORNEY OF RECORD
/s/Tonna K. Farrar

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.  (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.  Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.  Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**.  Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.